[Civ. No. 3743. Fifth Dist. Jan. 15, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
SYNANON FOUNDATION, INC., Defendant and Appellant.

**COUNSEL**

Dan L. Garrett, Jr., Howard M. Garfield and David F. Gomez for Defendant and Appellant.

Jay W. Powell and William A. Richmond, District Attorneys, Richard D. Sigmund and Robert C. Van Auken, Deputy District Attorneys, for Plaintiff and Respondent.

**OPINION**

**FRANSON, J.—**

### STATEMENT OF THE CASE[1]

This is an appeal from a pretrial order enjoining appellant from operating a private airport during the pendency of the action.

---

[1] In reciting the history of this controversy we must resort to the declarations presented by the parties because the trial court did not make comprehensive findings of facts and conclusions of law. Where the declarations are in conflict as to a matter necessary to

On May 31, 1977, respondent filed a complaint seeking to enjoin appellant's operation of an airport on its property in the Sierra foothills in the northeast corner of Tulare County. The complaint alleged that the airport constituted a public nuisance per se because it was being operated without a special use permit, in violation of Tulare County Zoning Ordinance No. 352.[2]

The district attorney's application for an ex parte temporary restraining order was denied on June 22, 1977, on the ground that respondent had failed to allege or prove any injury that would result to respondent before the matter was heard on notice.

Respondent's application for preliminary injunction was heard on June 28, 1977. On September 21, 1977, the trial court rendered a decision, finding that the airport had been constructed and operated in violation of the law in that a permit was required under the county ordinance; that appellant had constructed the airport with notice that a permit was required, and that "upon balancing the equities," appellant should be enjoined from operating the airport pending trial. The court specifically noted that its decision concerning the violation of the zoning ordinance was for the purpose of the preliminary injunction only and that the decision should not affect the ultimate rights of the parties at trial. On October 27, 1977, the preliminary injunction was issued. Appellant filed a timely notice of appeal.

On November 8, 1977, appellant petitioned this court for a writ of supersedeas and a stay of the enforcement of the injunction. We granted the petition and stayed the injunction pending the determination of the appeal.

STATEMENT OF FACTS

Appellant is a nonprofit religious and charitable corporation established for the purposes of furthering the Synanon religion and the reeducation of character disordered persons. In 1972 appellant purchased 360 acres of land in the western Sierra foothills near Badger, California, to serve as its executive offices and spiritual center. On June 30, 1976,

support the judgment, we presume, in accordance with established principles of appellate review, that the trial court resolved the conflict in respondent's favor. Where there is no conflict, we have relied on the facts asserted in appellant's declarations. We note, however, that neither our statement of facts nor the trial court's preliminary adjudication of the facts is binding at the trial on the merits.

[2]Tulare County Ordinance No. 352, section 21, provides that, ". . . any use, occupation or building or structure maintained contrary to the provisions hereof shall constitute a public nuisance."

appellant purchased an additional 1,790 acres of land near Badger known as the Stapp Ranch. The ranch included an 80-acre meadow at an elevation of 3,100 feet which appellant developed into a private airport. Appellant's investment in the land and improvements for the airport including a 4,450-foot long, 60-foot wide asphalt runway, adjacent hangars, buildings, airplanes and sailplanes was approximately $1.5 million.

The meadow where appellant's airport was established had been used for agricultural purposes for the 15 years immediately preceding appellant's acquisition of that property; however, the deposition of Mr. James Stapp, a prior owner of the property, revealed that the meadow was used as a landing strip for agricultural flights from 1951 to 1961. During that period portions of the meadow were also used for farming and quail hunting. In 1944 appellant's predecessor had applied to the Tulare County Board of Supervisors for approval of the site as an airport and on November 28, 1944, the supervisors granted the approval. In 1945 the Civil Aeronautics Administration approved the site as a "designated landing area" pursuant to the federal Civil Aeronautics Act of 1938. On May 17, 1949, the Tulare County Board of Supervisors adopted a "Master Plan of Airports" depicting the location of the airport as an approved proposed site for a recreational/emergency airport. In 1959 the supervisors adopted ordinance No. 703 which provided that airports depicted on the 1949 master plan did not require a special use permit.

A new airport master plan was adopted by the supervisors in 1970. This plan recited that airports shown on the 1949 plan did not require a special use permit in the A-1 zone where appellant's airport is located. The 1970 plan also expressed a need for a fog-free recreational multi-purpose airport in a designated area in the foothills. Appellant's airport is in the designated area. Subsequent to the enactment of the 1970 plan, Tulare County Zoning Ordinance No. 352 was amended to provide that airports in conformity with the 1970 plan located in the A-1 zone do not require special use permits.

In the spring of 1976, when appellant began to explore the possibility of acquiring the Stapp Ranch, its representatives communicated with Robert Wall, the Planning Director and Chief Zoning Administrator of Tulare County. According to appellant's affidavits, Wall said that the subject site would be suitable for an airport and that a special use permit would not be required. According to the declaration of Mr. Wall, he

merely advised appellant's representatives that he "hoped that they didn't need a permit for their proposed airport" and "recommended they look at the 1970 Airport Master Plan and the Tulare County Zoning Ordinance." Mr. Wall's declaration, however, is silent regarding any conversations which he may have had with appellant's representatives before July 6, 1976—the date the property was purchased. In a letter to Supervisor Fred Batkin dated July 13, 1976, Mr. Wall referred to a previous visit by appellant's representatives to his office and to their contention that appellant should be able to build an airport on the property without a permit. He states in his letter, "We are carefully checking their contention to see if that is true. *It appears . . . that it is.*" (Italics added.) The letter further states, "It appears that [the] airport does conform to the General Plan." Appellant's agents declared that they acted in reliance on Wall's representations when they purchased the Stapp Ranch and began to develop the meadow for use as an airport.

Shortly after appellant's acquisition of the property, Mr. Wall formally requested an opinion from the county counsel's office on whether a use permit was required for the airport. On July 21, 1976, a representative from the county counsel's office delivered an oral opinion concerning this question at a board of supervisors' meeting attended by one of appellant's attorneys. The county counsel tentatively concluded that a use permit would be required because the subject airport was not in conformity with the 1970 airport master plan and, therefore, the amended zoning ordinance No. 352 required a permit.

On that same day, July 21, appellant's representative sought the county planning department's approval for the construction of a "general storage building" on the subject site. At that time Joe Hickman, a representative of the planning department, issued a building permit for a storage building; Hickman told Synanon's agent that the building could not be used for airport purposes without a use permit. The next day, Mr. Wall wrote to appellant recommending that if the building was intended for airport use, no time or money should be invested until the required special use permit was obtained. Wall also stated that it might be difficult to obtain the permit because a number of local citizens opposed the development of the airport.

On July 29, 1976, the county counsel's office issued its written opinion (a copy of which was sent to appellant's counsel) that a use permit would be required for the airport. In substance, the county counsel ruled that a permit was required for the airport because it did not comply with the

1970 master plan in that it was not a "public use" airport, i.e., one open to the public. Also, the county counsel opined that the airport would not qualify as an "agricultural airport" without a permit.

Nevertheless, appellant continued to develop the property for an airport. It contends that it had no alternative because it already had let the contracts for construction of the runway and buildings at the airport when it was advised that a permit would be required. By August, the grading for the strip was accomplished and a number of buildings had been added to the meadow.

Appellant filed an application for a special use permit on August 12, 1976. It maintains that the permit was unnecessary and that the filing of the application was merely a good will and political gesture. Five months later the application was denied by the county planning commission. Appellant appealed the denial to the board of supervisors, then later withdrew its appeal. Appellant states that the reason for the withdrawal of the appeal was its discovery that the airport site had been approved in the 1949 master plan and that Tulare County zoning ordinances exempted airports in conformity with the master plan from the permit requirement.

Appellant completed development of the airport and commenced using it for flights and educational activities. On May 25, 1977, the Tulare County Board of Supervisors adopted a resolution directing the district attorney to file this action.

## DISCUSSION

This appeal presents the question of the standard to be applied by a trial court in ruling on an application for a preliminary injunction to enforce a zoning ordinance. We hold that absent a clear showing that the ordinance is being violated, the court must weigh the relative harm to the defendant if the injunction is issued as against the harm to the plaintiff if it is not issued; that only when the harm to the plaintiff outweighs the harm to the defendant should the injunction issue. Stated otherwise, it is only upon a clear showing that the zoning ordinance is being violated that a conclusive presumption of irreparable injury to the public arises so as to justify the injunction without balancing the relative harm to the parties.

Whether to grant a preliminary injunction rests in the sound discretion of the trial court, and the order will not be reversed on appeal absent a clear abuse of discretion. (*Continental Baking Co.* v. *Katz* (1968) 68

Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889].) However, since the decision is usually reached without a full hearing on the merits, it should not be made without balancing "the gravity of interim injury against the *possibility of interlocutory judicial error.*" (Italics added, Leubsdorf, *The Standard for Preliminary Injunctions* (1978) 91 Harv.L.Rev. 525.) As stated in *People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10 [141 Cal.Rptr. 20, 569 P.2d 125]: "To secure a preliminary injunction the People were required to show, by evidence which would be admissible in open court, that, pending a trial on the merits, defendants should be restrained from exercising the right claimed by them. The purpose of the injunction is to preserve the status quo until a final determination is made upon the merits, and *the issue before the court was whether defendants would suffer greater harm from its issuance than the People would suffer from its refusal.* In making this assessment, the court was required to determine whether there was a reasonable probability that the People would prevail on the merits. [Citation.]" (Italics added, *id.,* at p. 21.)

Respondent contends that since it seeks to enforce a zoning ordinance which provides that a violation of the ordinance is a public nuisance, it is relieved from proving actual harm to the public from the operation of the airport pending trial once it established to the trial court's satisfaction that respondent probably would prevail on the merits. Respondent argues that an irrebuttable presumption of public harm arises from a probable zoning violation, citing *People* ex rel. *Dept. Pub. Wks.* v. *Adco Advertisers* (1973) 35 Cal.App.3d 507 [110 Cal.Rptr. 849]. *Adco,* however, does not stand for such a proposition. In that case the state, acting through its department of public works, filed a complaint for an injunction to compel the removal of a billboard that violated the Outdoor Advertising Act. (Bus. & Prof. Code, § 5200 et seq.) The trial court found there was no triable issue of fact as to the statutory violation and summarily granted a permanent injunction. The appellate court affirmed, noting that the defendant had conceded that its billboard violated the law; hence, a fortiori, the billboard was a public nuisance. In the present case, there is a serious question whether appellant's airport violates zoning ordinance No. 352.

Assuming the airport is not exempt from the permit requirements merely because the site was approved under the 1949 master plan, a question would remain as to whether the airport conforms to the 1970 plan, thereby making a permit unnecessary. The latter plan recommends the establishment of an airport in a fog-free area which includes appellant's meadow; it expressly provides that the multi-purpose airport "could be initiated by private development" and that "a private airport

facility may satisfy" the need for such an airport. Whether the language of the 1970 plan should be interpreted as authorizing only a "public use" airport as contended by respondent or also a private use airport as contended by appellant, and whether the plan authorizes an airport only at one of the four designated sites or at any site within the fog-free area, are close questions indeed.

Respondent's brief illustrates the very complexity of the issues: respondent acknowledges that the trial court had to resolve an apparent inconsistency between the airport master plan and the zoning ordinance. The master plan recommends that use permits be required for *all* airports, whether in conformance with the master plan or not, while the zoning ordinance recognizes an exception for airports in conformity with the plan. To resolve this apparent inconsistency, the trial court had to take into consideration the provisions of Government Code section 26027 which requires local zoning ordinances to make provision for areas where airports can be located as conforming uses. Respondent then argues that construing the airport master plan, the zoning ordinance and Government Code section 26027 together, the trial court could reasonably conclude that the exception of the zoning ordinance was a limited one designed to meet the minimum requirements of Government Code section 26027, and limit the exception to only those airports in *strict* conformity with the airport master plan. Having concluded that the ordinance exception was limited to airports in strict conformance with the master plan, respondent then argues that the trial court could conclude that appellant's airport did not fall within the exception because it was not a public airport, and it was not located in one of the four suggested sites shown within the fog-free area. The argument is self-defeating in that substantial rather than strict conformance with the master plan may well satisfy the ordinance.

Even assuming the applicability of the permit requirement, there remains on the present record a serious question whether respondent will prevail at trial. Appellant asserts an estoppel defense alleging that it purchased the Stapp Ranch and developed the airport in reliance on express representations by the Tulare County Director of Planning that no permit would be required.  ■  The law is clear that "[t]he government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach*

v. *Mansell* (1970) 3 Cal.3d 462 at pp. 496-497 [91 Cal.Rptr. 23, 476 P.2d 423].) We are fully cognizant of the trial court's implied finding that appellant acted in bad faith in constructing the airport after notice that a permit would be required. We also recognize that the estoppel doctrine is inapplicable where it would defeat a strong public policy. (*Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720 [125 Cal.Rptr. 896, 543 P.2d 264]; *Carty* v. *City of Ojai* (1978) 77 Cal.App.3d 329, 340-344 [143 Cal.Rptr. 506]; Cunningham, *Vested Rights, Estoppel, and the Land Development Process* (1978) 29 Hastings L.J. 625, 648-660.) Whether the operation without a special use permit of a privately owned, private use airport in the Sierra foothills available for emergency public use contravenes public policy is nebulous indeed.    ▮  We do not suggest how this issue ultimately will be decided; we hold only that the estoppel question should not be decided on the basis of the perfunctory and conclusory affidavits which were before the trial court at the hearing on the preliminary injunction.

Appellant also contends that the provisions of ordinance No. 352 which require a special use permit for an airport in an A-1 zone are unconstitutionally vague under the Fourteenth Amendment; that a statute which either forbids or requires the doing of an act in terms so uncertain that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process. This standard has been applied to zoning regulations. (*Sechrist* v. *Municipal Court* (1976) 64 Cal.App.3d 737, 745 [134 Cal.Rptr. 733]; *People* v. *Binzley* (1956) 146 Cal.App.2d Supp. 889 [303 P.2d 903].) The fact that the Tulare County Planning Director believed that appellant would be exempt from the permit requirement under ordinance No. 352, at the very least suggests an uncertainty in the law. In *State Bd. of Barber Examiners* v. *Star* (1970) 8 Cal.App.3d 736 [87 Cal.Rptr. 450] a pertinent observation is made concerning the adjudication of constitutional issues at a preliminary hearing: "This case . . . presents a good example for application of the general rule that a preliminary injunction should not determine the ultimate rights of the parties. While the court below purported to rule on one of the constitutional questions involved, we hold that was an interim ruling which will not bind the court one way or the other at the trial [citations]." (8 Cal.App.3d at p. 740.)

Since it is not clear that the permit requirements of ordinance No. 352 apply to appellant's airport and, if they do apply, that respondent will prevail on the estoppel and constitutional questions, the trial court should have weighed the relative harm to respondent if the injunction did not issue vis-à-vis the harm to appellant if it were granted. (*People* v. *Pacific*

*Land Research Co., supra,* 20 Cal.3d 10, 21; *Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d 512, 528; see also *Town of Southeast* v. *Gonnella* (1966) 26 App.Div.2d 550 [270 N.Y.S.2d 863]; *Town of Carmel* v. *Meadowbrook National Bank* (1959) 15 Misc.2d 789 [182 N.Y.S.2d 465]; Leubsdorf, *The Standard for Preliminary Injunctions, supra,* 91 Harv.L. Rev. 525.) Although the trial court stated in its decision granting the preliminary injunction that it had balanced the "equities," it is clear that it did not weigh the relative harm to the parties. The record contains no proof of injury to the health, safety or enjoyment of life or property which individuals or the community would suffer by reason of the operation of the airport. (Civ. Code, §§ 3479, 3480.) The trial court accepted the People's argument that by reason of the probable ordinance violation it would suffer irreparable harm if the injunction did not issue. The finding that appellant had constructed the airport with notice of the permit requirement presupposed the applicability of that requirement. Thus, in deciding to issue the injunction the court did not consider the "possibility of interlocutory judicial error" in its holding that the airport operation constituted a zoning violation. It failed to weigh this possibility of error against the interim injury to be suffered by the appellant. (Leubsdorf, *The Standard for Preliminary Injunctions, supra,* 91 Harv.L.Rev. 525.)

Whether or not we agree with appellant's charitable and religious purposes and its business methods, it made a strong showing of interim harm if the injunction should issue. The application for preliminary injunction was made approximately one year after appellant had purchased the site and expended moneys in constructing the airport and the acquisition of personnel and aircraft. The declarations show that the suspension of flights would jeopardize appellant's educational activities and the expeditious transporting of its members to and from its Badger facilities.

We recognize the strong governmental interest in enforcing a zoning ordinance; yet, if it is still unclear at the preliminary injunction stage whether the activities to be enjoined violate the ordinance, the injunction should not issue in the absence of proof of actual interim harm to the public resulting from the potential violation.

The trial court's failure to balance appellant's showing of interim harm against the governmental interest in securing compliance with the ordinance was an abuse of discretion.[3]

---

[3]We need not discuss appellant's alternate contention that although the injunction is framed in prohibitory language, it is mandatory in character since it contemplates a

We note finally that over a year and a half has elapsed since the commencement of this action. The best interests of the parties demand a speedy resolution of the issues involved here; we therefore deem it appropriate to suggest that the trial court schedule this action for trial at the earliest possible date.

The judgment is reversed.

Brown (G. A.), P. J., concurred.

HOPPER, J., Concurring.—The majority sets out a standard beginning as follows: ". . . absent a clear showing that the ordinance is being violated . . . ." I would emphasize that language because I believe it to be the important part of the holding. The majority opinion then goes on to explain various difficulties with the application of the particular zoning ordinance to the facts of this case. I agree that there are serious questions as to the applicability of the ordinance in question to Synanon.

I also agree with the conclusion of the majority that a preliminary injunction ". . . should not issue in the absence of proof of actual interim harm to the public resulting from the potential violation." However, in my opinion, a delay in the enforcement of a zoning ordinance results in "actual interim harm to the public" which can and should be weighed against the potential injury to Synanon.[1]

Zoning ordinances are an integral part of land use regulation; they result from extensive hearings before governmental bodies attempting to balance various competing interests. Just as "no man is an Iland, intire of it selfe . . ." (John Donne), every part of a planning design is dependent

change in the relative position or rights, of the parties as they existed at the time of the application for the preliminary injunction (see *Paramount Pictures Corp.* v. *Davis* (1964) 228 Cal.App.2d 827, 835 [39 Cal.Rptr. 791]; *Johnston* v. *Superior Court* (1957) 148 Cal.App.2d 966, 970 [307 P.2d 946]; 38 Cal.Jur.3d, Injunctions, §§ 8, 9, pp. 469-474). It is well-established that a preliminary mandatory injunction may only be granted in extreme cases, where the right thereto is clearly established, and irreparable injury to the moving party would otherwise result (*Hagen* v. *Beth* (1897) 118 Cal. 330, 331 [50 P. 425]; *Paramount Pictures Corp.* v. *Davis, supra,* 228 Cal.App.2d at pp. 838-839).

[1]The resulting harm is directly related to the length of the delay. Unfortunately, the time between the granting or denial of a preliminary injunction and the final determination of the matter by the granting or denial of a permanent injunction has been greatly extended by reason of the burgeoning case load thrust upon the trial courts in other areas. In this regard the Legislature should consider the granting of priority to the hearing of permanent injunction cases when a public entity is a party, much as is now given to all parties concerned at the preliminary injunction stage.

upon the remainder and a tear in that design results in damage to the entire fabric. Thus, when a court delays enforcement of even a small part of land use regulation, it interferes with legislative action. The fact that the resulting damage may be difficult to assess does not make it nebulous or nonexistent.

On the present record, in weighing the respective harm on both sides, I agree that the balance must be struck in favor of the appellant.

A petition for a rehearing was denied February 9, 1979, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied March 14, 1979.